# IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **DARLENE G. BARRETT-LASSITER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 13-CV-627-PJC** |
| | ) | |
| **CAROLYN W. COLVIN,** | ) | |
| **Acting Commissioner of the** | ) | |
| **Social Security Administration,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## OPINION AND ORDER

Plaintiff, Darlene G. Barrett-Lassiter ("Barrett-Lassiter"), pursuant to 42 U.S.C. § 405(g), requests judicial review of the decision of the Commissioner of the Social Security Administration ("Commissioner") denying Barrett-Lassiter's applications for disability insurance benefits and supplemental security income benefits pursuant to the Social Security Act, 42 U.S.C. §§ 401 *et seq.* In accordance with 28 U.S.C. § 636(c)(1) and (3), the parties have consented to proceed before a United States Magistrate Judge. Any appeal of this order will be taken directly to the Tenth Circuit Court of Appeals. Barrett-Lassiter appeals the decision of the Administrative Law Judge ("ALJ") and asserts that the Commissioner erred because the ALJ incorrectly determined that Barrett-Lassiter was not disabled. For the reasons discussed below, the Court **AFFIRMS** the Commissioner's decision.

## Claimant's Background

Barrett-Lassiter was 45 years old at the time of the second hearing before the ALJ on March 31, 2009. (R. 86, 273). She testified that she had been "clean and sober" since January 27, 2007. (R. 94).

Barrett-Lassiter testified that the reasons why she could not work at the time of the second hearing were that she could stand for only five or ten minutes at a time, and she could sit for only 45 minutes. (R. 95). She thought the problem was her neck and her back. *Id.* She said that she got pain and numbness in her left arm and she dropped items. (R. 95-96, 100). She had trouble with buttons and zippers. (R. 59). Barrett-Lassiter said she spent most of her time lying down. (R. 96-97). If she was not lying down, she had her feet propped up. (R. 97). She said her pain was very inconsistent, and she did not know what exacerbated it. (R. 97-98). She was limited in her ability to turn her head to the left. (R. 98-99). Reaching up caused pain. (R. 99-100). Barrett-Lassiter said that when she drove, she kept only one hand on the wheel at a time, because her hands would go to sleep. (R. 100). She lifted only about five or ten pounds at a time. (R. 101).

Barrett-Lassiter testified that her back pain was as intense as her neck pain. *Id.* She took hot showers more than once a day to try to alleviate her pain. (R. 101-02). She said that her left leg fell "out from under" her at least a couple of times a month. *Id.* She would be in pain walking back from a store two blocks away. (R. 102). She lost her balance and fell at least a couple of times a month, and she stumbled approximately every other day. (R. 103-04).

Barrett-Lassiter said that she slept only about two or three hours a night total. (R. 104-05). She could fall asleep, but she would awaken because of tingling in her arms, and she would change positions. (R. 105). She took naps almost every day. (R. 108).

Barrett-Lassiter described examples of her psychological problems as going into a rage and throwing everything in her house out, and going to bed for two or three days in a row. (R. 106-07). When asked if she understood what bipolar disorder was, she said "not exactly." (R. 107). She had days when she ate a lot. *Id.* She weighed about 233 pounds, and she considered

her usual weight to be about 170 or 180 pounds. *Id.* She didn't leave her house at least three days a month. (R. 108). She watched television, but she had difficulty concentrating on a show that was one or two hours long. (R. 108-09). She had difficulty being around people, and she gave Wal-Mart as an example. (R. 109-10). She excessively pulled out her hair. (R. 110-11).

When asked at the third hearing on September 9, 2011, why she could not work at a full-time job, Barrett-Lassiter said that she had trouble concentrating. (R. 49). She also said that she could not be around people, because when she became angry she would "manic out" and not know what she was doing. *Id.* She gave an example that she would only go to Wal-Mart late at night. (R. 50). She agreed that stress could cause problems. (R. 51). She said that she took someone with her when she saw a doctor because otherwise she might "start hollering." *Id.* She said she could be "kind of mean" in the work place. *Id.* After an incident when she became upset with her doctor, she was depressed for a couple of days. (R. 52). During a depressed episode like that, she would stay in bed with the curtains shut, only getting up to eat, drink, and go to the bathroom. *Id.* She said she had gained weight since the second hearing, because she ate too much and did not get activity. (R. 53).

Barrett-Lassiter said that she did not sleep well, although she did take medication to help her sleep. *Id.* She had nightmares, and she would sometimes lose her breath by hyperventilating. *Id.* She propped herself up with pillows. *Id.* She would sleep for two or three hours at a time and four to six hours total at night. (R. 54).

Barrett-Lassiter said that on a typical day she tried to get up at 8:00 a.m., but she had been "down" at the time before the third hearing, so she got up around 10:00 a.m. (R. 58). She took her medications and drank coffee. *Id.* She might make something like tuna salad in the kitchen for the three people living in the house. (R. 58-59). She might do dishes, and then she would

need to sit down.  *Id.*  She said that she got tired after standing or walking for five or ten minutes, and she would use a stool to sit on so that she could continue cooking or washing the dishes.  (R. 59).

When asked how she remembered to take her medications, Barrett-Lassiter said that a friend set them out for her.  *Id.*  She gave cutting her finger while cooking as an example of lack of concentration.  (R. 54-55).  She said she would sometimes ramble while talking and forget what she had started out talking about.  (R. 55).  She watched television sometimes, but she had trouble focusing on any program that was serious.  (R. 58).  She had difficulty driving a car due to lack of focus and concentration.  (R. 55-56).  She said she had not driven since January 2011. (R. 56).  She said that her hands would go numb.  *Id.*  She also became stressed, leading to tension in her back.  *Id.*

She said that she had not had a problem with drugs since a boyfriend three or four years earlier.  (R. 57-58).

Barrett-Lassiter said that she had been experiencing headaches beginning in July before the third hearing in September 2011.  (R. 60).  When she had them, the headaches made her nauseated, and she would need to lie down in a dark room.  *Id.*  She could not give an idea of how frequently she experienced them, because it might be two times one week and once the next week.  (R. 60-61).

Barrett-Lassiter said that she believed that her mental problems were worse in the years leading up to the third hearing in September 2011, but she was handling them better because she lived in the country and was not around people often.  (R. 61).

An MRI of Barrett-Lassiter's cervical spine on October 27, 2004 reflected spondylosis changes and a "very large extruded disc fragment at the C5/C6 level occupying almost 50% of the spinal canal on the left side." (R. 364).

Barrett-Lassiter was seen by Christopher M. Boxell, M.D., for a consultation on January 19, 2005. (R. 366-68). On examination, Barrett-Lassiter had good range of motion of the neck with slight diminishment. (R. 367). She had some pain with range of motion testing. *Id.* She had tenderness especially on the left side. *Id.* She also had tenderness at the L5/S1 level, as well as tenderness down her left leg. *Id.* She had full range of motion of the lower back. *Id.* Dr. Boxell's impressions were degenerative cervical disc disease; herniated disc at C5/C6 on the left; left C6 radiculopathy; chronic low back pain; and left trochanteric bursitis. (R. 368).

An MRI of Barrett-Lassiter's lumbar spine on January 31, 2005 showed degenerative disc disease with loss of disc space water and mild annular disc protrusion at the L4/L5 level and mild degenerative changes at the L5/S1 level. (R. 369).

Barrett-Lassiter returned to see Dr. Boxell on March 30, 2005, and he recounted several examples of what he called "a very peculiar affect and demeanor." (R. 365). He concluded that Barrett-Lassiter was not in significant pain. *Id.* Dr. Boxell said that Barrett-Lassiter did not manifest significant findings suggesting pain, and he did not think surgery would be beneficial. *Id.* He said that Barrett-Lassiter should be followed and managed medically. *Id.*

The administrative transcript includes a request for services form apparently from CREOKS Mental Health Center ("CREOKS") dated August 4, 2006. (R. 389-95). Barrett-Lassiter reported her last use of alcohol and methamphetamine was three months earlier, and she had last used marijuana two month earlier. (R. 389).

A discharge summary from St. John Medical Center stated that Barrett-Lassiter had been treated on an in-patient basis from January 23, 2007 to January 29, 2007. (R. 373-80). She apparently presented seeking detox from alcohol, but she also appeared "very dysphoric." (R. 373). It was noted that Barrett-Lassiter was non-compliant with medication and treatment from CREOKS. *Id.* Her discharge diagnoses on Axis I[1] were polysubstance dependence, mainly alcohol and cocaine; and mood disorder, not otherwise specified. *Id.* Her Global Assessment of Functioning ("GAF")[2] was assessed as 55. *Id.*

A CREOKS treatment plan dated February 12, 2007 was signed by Barrett-Lassiter and a mental health team. (R. 382-88). Axis I diagnoses were bipolar I disorder most recent episode mixed, severe, without psychotic features; alcohol dependence; generalized anxiety disorder; and rule out substance-induced anxiety disorder. (R. 383). Her GAF was assessed as 49. *Id.*

A CREOKS progress note signed S. Tandon, M.D., dated January 24, 2008 stated that Barrett-Lassiter was seen for follow-up. (R. 472). Barrett-Lassiter complained of anxiety and stress, especially in caring for her handicapped 19-year-old daughter. *Id.* Dr. Tandon assessed

---

[1] The multiaxial system "facilitates comprehensive and systematic evaluation." *See* American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 27 (Text Revision 4th ed. 2000) (hereinafter "DSM IV").

[2] The GAF score represents Axis V of a Multiaxial Assessment system. *See* DSM IV at 32-36. A GAF score is a subjective determination which represents the "clinician's judgment of the individual's overall level of functioning." *Id.* at 32. The GAF scale is from 1-100. *Id.* A GAF score between 21-30 indicates "behavior is considerably influenced by delusions or hallucinations or serious impairment in communication or judgment . . . or inability to function in almost all areas." *Id.* at 34. A score between 31-40 indicates "some impairment in reality testing or communication . . . or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood." *Id.* A GAF score of 41-50 reflects "serious symptoms . . . or any serious impairment in social, occupational, or school functioning." *Id. See also Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1162 n.1 (10th Cir. 2012).

bipolar disorder not otherwise specified and anxiety not otherwise specified, and he said that Barrett-Lassiter was improving with medication. *Id.* He adjusted her medications. *Id.*

A CREOKS assessment dated June 13, 2008 was signed by a clinical staff member. (R. 465-71). The handwriting on one portion of the form stated that Barrett-Lassiter had been off of her medications for the past year. (R. 467). In another portion of the form, the writing stated that Barrett-Lassiter drank alcohol within the previous week and smoked marijuana a couple of weeks earlier. (R. 468). She had taken cocaine and methamphetamine in 2007. *Id.* Barrett-Lassiter's Axis I diagnosis was stated as bipolar disorder, most recent episode manic. (R. 469). Her GAF was stated as 45. *Id.*

A CREOKS treatment plan was signed by Barrett-Lassiter and a clinical staff member on July 17, 2008. (R. 458-64). Barrett-Lassiter's diagnosis was again stated as bipolar I disorder, most recent episode manic, and her GAF was stated as 45. (R. 458). The complexity and severity of her condition was described as moderate. *Id.*

Barrett-Lassiter was seen at St. John Sapulpa on January 21, 2009 for right knee pain related to a fall. (R. 483-90). X-rays of her right ankle were unremarkable, but a lateral view of her right knee showed a nondisplaced fracture of the neck of the fibula. (R. 489). She presented to Claremore Indian Hospital on January 23, 2009 requesting pain medications. (R. 531-33).

Barrett-Lassiter was seen at Claremore Indian Hospital on September 2, 2009 for follow up of hypertension, refill of medications, and evaluation of degenerative joint disease in her neck and back. (R. 506-09). On examination, Barrett-Lassiter had mild tenderness of her cervical spine and normal range of motion of her neck, shoulders, hands, and arms. (R. 507). She had a normal gait. *Id.* Her primary assessment was chronic low back pain, and other assessments were

hyperlipidemia, chronic cervical pain, bipolar disease with fair control, and tobacco abuse. (R. 508). The doctor noted an extensive discussion of cessation of tobacco use. (R. 503, 509).

Hand-written progress notes indicate that Barrett-Lassiter saw Subramaniam Krishnamurthi, M.D., from April 2004 through May 2010. (R. 438-51, 538-84). Beginning with an appointment on May 19, 2010, Dr. Krishnamurthi's notes were computerized. (R. 585). Barrett-Lassiter was seen for follow-up and refill of back pain medications. *Id.* On examination, Barrett-Lassiter had reduced range of motion of the lumbar spine. *Id.* She was assessed with back strain, benign hypertension, and obesity. *Id.* Her Lortab was refilled. (R. 586). At her next appointment on June 16, 2010, Barrett-Lassiter complained of neck pain in addition to back pain. (R. 587-88). Barrett-Lassiter saw Dr. Krishnamurthi approximately once a month from July 2010 through May 2011. (R. 589-608).

An MRI of Barrett-Lassiter's lumbar spine was completed on November 24, 2010, and broad-based bulges were seen at the L3/L4, L4/L5, and L5/S1 levels. (R. 539). The radiologist characterized this as mild degenerative disc disease. *Id.*

Barrett-Lassiter was seen at Okmulgee Indian Health Center on March 10, 2011 for a follow-up appointment regarding her hypertension. (R. 563). She complained of falling a lot, back pain, and neck pain. *Id.* She requested more pain medication. *Id.* Assessments were hypertension, hyperlipidemia, bipolar disorder, lower back pain, and depression. *Id.* Several medications were prescribed. *Id.*

A CT scan of Barrett-Lassiter's cervical spine was completed on March 25, 2011. (R. 540-41). Degenerative disc space narrowing was noted at the C5/C6 level "with posterior osteophytosis, which are asymmetric on the left, which narrow the left neural foramina." (R. 541). Results for the other levels of the cervical spine were unremarkable. (R. 540).

Barrett-Lassiter and a clinical staff member at CREOKS signed an updated treatment plan on April 5, 2011.  (R. 611-21).

Barrett-Lassiter was evaluated for back pain by Hugo S. Salguero, M.D. on June 6, 2011. (R. 552-58).  On physical examination, Barrett-Lassiter was able to walk on her toes and her heels, and she was able to perform a squat.  (R. 553).  Dr. Salguero's opinion was that Barrett-Lassiter's pain needed to be evaluated by a gynecologist, and he deferred further medication management to her primary care physician or gynecologist.  (R. 554).  A drug screen performed at that time was consistent with use of Lortab and clonazepam.  (R. 556).  No illicit drugs were detected.  (R. 557).

Barrett-Lassiter was seen at the Okmulgee Indian Health Center on August 1, 2011, complaining of severe migraines two-to-four times weekly, lasting all day, with a pain level of 9. (R. 560).

Agency consultant Melanie Munn, M.D. completed a physical examination of Barrett-Lassiter on April 30, 2007.  (R. 403-08).  On examination, Dr. Munn found that Barrett-Lassiter moved about the examination room easily and had full range of motion of her spine.  (R. 404). Straight leg raising was negative, and toe and heel walking was normal.  *Id.*  Barrett-Lassiter's gait was stable.  *Id.*  Dr. Munn's assessments were chronic low back pain with a history of degenerative disc disease; bipolar disorder; alcohol abuse; and polysubstance abuse.  *Id.*

Nonexamining agency consultant Shafeek Sanbar, M.D., completed a Physical Residual Functional Capacity Assessment on May 23, 2007.  (R. 428-35).  For exertional limitations, Dr. Sanbar found that Barrett-Lassiter could perform work at the "light" level.  (R. 429).  For explanation, Dr. Sanbar noted the degenerative disc disease reflected in the MRI dated March 30, 2005.  He summarized Dr. Munn's report and Barrett-Lassiter's activities of daily living.  (R.

429-30).   Dr. Sanbar found no postural, manipulative, visual, communicative, or environmental limitations.  (R. 430-32).

Agency consultant Denise LaGrand, Psy.D., evaluated Barrett-Lassiter on April 24, 2007.  (R. 396-402).  Dr. LaGrand noted that Barrett-Lassiter seemed anxious.  (R. 398).  Dr. LaGrand's impressions on Axis I were moderate major depressive disorder; generalized anxiety disorder; tricotillamania; and alcohol abuse in early remission by self report.  (R. 400).  On Axis II, Dr. LaGrand's impressions were personality disorder, not otherwise specified; and borderline histrionic and dependence traits.  *Id.*  Barrett-Lassiter's GAF was scored as 40.  *Id.*  In her summary, Dr. LaGrand stated that Barrett-Lassiter's ability to be reliable, to communicate and to interact in a socially-adequate manner, and to function independently was poor.  *Id.*  She found no problems with Barrett-Lassiter's concentration, memory, persistence, or pace.  (R. 400-01).  She said that Barrett-Lassiter's ability to perform adequately in most job situations, to handle the stress of a work setting, and to deal with supervisors and co-workers was estimated to be low average.  (R. 401).

Nonexamining agency consultant Tom Shadid, Ph.D., completed a Psychiatric Review Technique form and Mental Residual Functional Capacity Assessment on May 22, 2007.  (R. 410-27).  On the Psychiatric Review Technique form, for Listing 12.04, Dr. Shadid noted depressive syndrome and bipolar syndrome.  (R. 413).  For Listing 12.06, Dr. Shadid noted generalized persistent anxiety and trichotillomania.  (R. 415).  For Listing 12.08, Dr. Shadid noted inflexible and maladaptive personality traits; and personality disorder, not otherwise specified.  (R. 417).  For Listing 12.09, Dr. Shadid noted behavioral changes or physical changes associated with the regular use of substances that affect the central nervous system.  (R. 418).

For the "Paragraph B Criteria,"[3] Dr. Shadid found that Barrett-Lassiter had moderate restriction of activities of daily living, moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace. (R. 420). He found insufficient evidence regarding episodes of decompensation. *Id.* In the "Consultant's Notes" portion of the form, Dr. Shadid very briefly noted some treating evidence. (R. 422). He briefly summarized Dr. LaGrand's report and Barrett-Lassiter's activities of daily living. *Id.*

On the Mental Residual Functional Capacity Assessment, Dr. Shadid found that Barrett-Lassiter was markedly limited in her ability to understand, remember, and carry out detailed instructions and in her ability to interact appropriately with the general public. (R. 424-25). He found that Barrett-Lassiter had no other significant limitations. *Id.* In his narrative assessment, Dr. Shadid said that Barrett-Lassiter could perform simple tasks with routine supervision, could relate to supervisors and peers on a superficial work basis, could not relate to the general public, and could adapt to a work situation. (R. 426).

Dr. Tandon from CREOKS signed a "Mental Status Form" and a "Mental Residual Functional Capacity Assessment" form on January 24, 2009. (R. 452-55). On the assessment form, of 20 categories, Dr. Tandon said that Barrett-Lassiter had severe limitations in three categories: her ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; her ability to work in coordination with or proximity to

---

[3] There are broad categories known as the "Paragraph B Criteria" of the Listing of Impairments used to assess the severity of a mental impairment. The four categories are (1) restriction of activities of daily living, (2) difficulties in maintaining social functioning, (3) difficulties in maintaining concentration, persistence or pace, and (4) repeated episodes of decompensation, each of extended duration. Social Security Ruling ("SSR") 96-8p; 20 C.F.R. Part 404 Subpt P, App. 1 ("Listings") § 12.00C. *See also Carpenter v. Astrue*, 537 F.3d 1264, 1268-69 (10th Cir. 2008).

others without being distrcted by them; and her ability to complete a normal work day and work week without interruptions from psychologically-based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. (R. 452). He found marked limitations in four additional categories, moderate limitations in three categories, and no significant limitation in the remaining ten. (R. 452-53).

On the Mental Status Form, Dr. Tandon said that Barrett-Lassiter's mood swings had improved, but she still experienced "downs" and irritability. (R. 454). He said her affect was mildly anxious. *Id.* Dr. Tandon said that stress made Barrett-Lassiter's symptoms worse. *Id.*

### Procedural History

Barrett-Lassiter filed her application for disability insurance benefits and supplemental security income benefits in February 2007. (R. 273-74). Barrett-Lassiter asserted onset of disability on August 4, 2006. (R. 273). The applications were denied initially and on reconsideration. (R. 153-60, 164-69). Administrative hearings were held before ALJ Deborah L Rose on November 25, 2008 and March 31, 2009. (R. 86-129). By decision dated May 7, 2009, the ALJ found that Barrett-Lassiter was not disabled. (R. 137-48). On April 13, 2011, the Appeals Council remanded Barrett-Lassiter's application to the ALJ for further proceedings. (R. 150-51).

A third administrative hearing was held September 9, 2011. (R. 40-77). By decision dated March 29, 2012, the ALJ again found that Barrett-Lassiter was not disabled. (R. 21-31). On July 22, 2013, the Appeals Council denied further review. (R. 1-6). Thus, the March 29, 2012 decision of the ALJ represents the Commissioner's final decision for purposes of this appeal. 20 C.F.R. §§ 404.981, 416.1481.

## Social Security Law and Standard Of Review

Disability under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. § 423(d)(1)(A). A claimant is disabled under the Act only if his "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work in the national economy." 42 U.S.C. § 423(d)(2)(A). Social Security regulations implement a five-step sequential process to evaluate a disability claim. 20 C.F.R. § 404.1520.[4] *See also Wall v. Astrue*, 561 F.3d 1048, 1052-53 (10th Cir. 2009) (detailing steps). "If a determination can be made at any of the steps that a claimant is or is not disabled, evaluation under a subsequent step is not necessary." *Lax*, 489 F.3d at 1084 (citation and quotation omitted).

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g). This Court's review is limited to two inquiries: first, whether the decision was supported

---

[4] Step One requires the claimant to establish that he is not engaged in substantial gainful activity, as defined by 20 C.F.R. § 404.1510. Step Two requires that the claimant establish that he has a medically severe impairment or combination of impairments that significantly limit his ability to do basic work activities. *See* 20 C.F.R. § 404.1520(c). If the claimant is engaged in substantial gainful activity (Step One) or if the claimant's impairment is not medically severe (Step Two), disability benefits are denied. At Step Three, the claimant's impairment is compared with certain impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App.1 ("Listings"). A claimant suffering from a listed impairment or impairments "medically equivalent" to a listed impairment is determined to be disabled without further inquiry. If not, the evaluation proceeds to Step Four, where the claimant must establish that he does not retain the residual functional capacity ("RFC") to perform his past relevant work. If the claimant's Step Four burden is met, the burden shifts to the Commissioner to establish at Step Five that work exists in significant numbers in the national economy which the claimant, taBarrett-Lassiter into account his age, education, work experience, and RFC, can perform. *See Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007). Disability benefits are denied if the Commissioner shows that the impairment which precluded the performance of past relevant work does not preclude alternative work. 20 C.F.R. § 404.1520.

by substantial evidence; and, second, whether the correct legal standards were applied.  *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004) (quotation omitted).

Substantial evidence is such evidence as a reasonable mind might accept as adequate to support a conclusion.  *Wall*, 561 F.3d at 1052 (quotations and citations omitted).  Although the court will not reweigh the evidence, the court will "meticulously examine the record as a whole, including anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met."  *Id.*

## Decision of the Administrative Law Judge

In her March 29, 2012 decision, the ALJ found that Barrett-Lassiter met insured status requirements through March 31, 2007.  (R. 23).  At Step One, the ALJ found that Barrett-Lassiter had not engaged in any substantial gainful activity since her alleged onset date of August 4, 2006.  *Id.*  At Step Two, the ALJ found that Barrett-Lassiter had severe impairments of degenerative disc disease of the cervical and lumbar spine, bipolar disorder, generalized anxiety disorder, personality disorder, and a history of substance abuse.  *Id.*  At Step Three, the ALJ found that Barrett-Lassiter's impairments did not meet any Listing.  (R. 23-24).

The ALJ found that Barrett-Lassiter had the RFC to perform a range of work at the light exertional level.  (R. 25).  For mental limitations, the ALJ said that Barrett-Lassiter could not be part of a work team, but she could perform superficial and incidental work-related interaction with co-workers and supervisors.  (R. 25-26).  Barrett-Lassiter could have no contact with the public and was further limited to simple, unskilled, and routine tasks.  (R. 26).  At Step Four, the ALJ determined that Barrett-Lassiter could not return to past relevant work.  (R. 29).  At Step Five, the ALJ found that there were a significant number of jobs in the national economy that Barrett-Lassiter could perform, taking into account her age, education, work experience, and RFC.  (R.

29-30).  Therefore, the ALJ found that Barrett-Lassiter was not disabled at any time from August 4, 2006, through the date of her decision.  (R. 31).

**Review**

Barrett-Lassiter's first argument is stated broadly as an assertion that the ALJ's RFC determination was unsupported by substantial evidence.  Plaintiff's Opening Brief, Dkt. #13, p. 5. She makes several arguments under this broad topic.  *Id.* at 5-9.  Her second argument is that the ALJ failed to properly consider her obesity.  *Id.* at 5.  Regarding the issues raised by Barrett-Lassiter, the Court finds that the ALJ's decision is supported by substantial evidence and complies with legal requirements.  Thus, the ALJ's decision is **AFFIRMED**.

## The ALJ's RFC Determination

Barrett-Lassiter's first argument is that it was erroneous for the ALJ to rely upon the opinion evidence of Dr. Sanbar in developing her RFC determination, because Dr. Sanbar was a nonexamining consultant and because he was a cardiologist.  Plaintiff's Opening Brief, Dkt. #13, p. 5.  The undersigned rejects this argument, which is in conflict with Tenth Circuit precedent that approves of the use of nonexamining consultants to provide functional assessments and that holds that the opinion evidence of a nonexamining agency consultant is substantial evidence upon which an ALJ is entitled to rely.  *Flaherty v. Astrue*, 515 F.3d 1067, 1071 (10th Cir. 2007) (nonexamining consultant's opinion was an acceptable medical source which the ALJ was entitled to consider and which supported his RFC determination); *Franklin v. Astrue*, 450 Fed. Appx. 782, 790 (10th Cir. 2011) (unpublished) (RFC assessment of agency nonexamining physician was substantial evidence supporting ALJ's conclusion); *Barrett v. Astrue*, 340 Fed. Appx. 481, 485 (10th Cir. 2009) (unpublished) (ALJ was entitled to rely upon opinion of nonexamining

psychiatrist). Even if Dr. Sanbar's specialty was not particularly necessary for the general medical opinions he gave related to Barrett-Lassiter's applications, that does not disqualify those opinions.

There is also no Tenth Circuit support for Barrett-Lassiter's argument that the ALJ should have ordered a second physical examination with functional capabilities to the determined by that consultant. Moreover, Barrett-Lassiter's attorney did not request a second consultative physical examination at either the second or third hearings.[5] (R. 43-46, 76-77, 89, 117). Instead, at the third hearing, Barrett-Lassiter's attorney stated that he "believe[d] that primarily the reason [Barrett-Lassiter] would not be able to do a full-time competitive sustained job would be because of her mental health issues." (R. 45). When a claimant is represented by counsel, the ALJ can ordinarily rely on counsel to structure and present the claimant's case. *Hawkins v. Chater*, 113 F.3d 1162, 1166-67 (10th Cir. 1997). In a 2011 unpublished case, the Tenth Circuit said that the ALJ was not required to address, *sua sponte*, a Listing for mental retardation when the attorney for the claimant had not suggested that the Listing was applicable, but had instead argued that the claimant had a borderline IQ. *Bland v. Astrue*, 432 Fed. Appx. 719, 722 (10th Cir. 2011) (unpublished). The *Bland* court also stated that there was no reason to excuse the claimant's attorney from her "important duty" to frame the issues for the ALJ. *Id., quoting Wall*, 561 F.3d at 1062. The undersigned finds that the ALJ was not required to order a second physical consultative examination of Barrett-Lassiter.

Barrett-Lassiter makes similar arguments regarding the opinion evidence of mental nonexamining consultant Dr. Shadid, asserting that the ALJ was not entitled to rely upon his opinion. As discussed above, Tenth Circuit precedent is contrary to Barrett-Lassiter's argument

---

[5] Barrett-Lassiter was unrepresented at the first hearing, and so her matter was continued to allow her to obtain representation. (R. 118-29).

that a nonexamining consultant's opinions are not substantial evidence. Barrett-Lassiter also

objects that Dr. Shadid's opinions were given almost five years before the ALJ's decision.

Barrett-Lassiter's attorney did not make any objection to Dr. Shadid's report, and he did not

request a new mental examination of his client. (R. 43-46, 76-77, 89, 117). Pursuant to the

authorities discussed above in relationship to the opinion evidence of Dr. Sanbar, the evidence of

Dr. Shadid was substantial evidence upon which the ALJ was entitled to rely, and she was also

entitled to rely upon counsel's framing of the case, which did not include any request for an

updated mental assessment. Further, the treating evidence during the time period of 2007 to 2012

does not show that Barrett-Lassiter's mental conditions changed in such a marked way that a new

assessment was needed. *Compare Chapo v. Astrue*, 682 F.3d 1285, 1293 (10th Cir. 2012)

(opinion of agency examining consultant was "patently stale" when the relevant medical record

had "material changes" after his opinion was given).

Barrett-Lassiter next asserts that the ALJ did not supply good reasons for giving "little"

weight to the opinion evidence of her treating psychiatrist, Dr. Tandon. Plaintiff's Opening Brief,

Dkt. #13, pp. 6-9. Regarding opinion evidence, generally the opinion of a treating physician is

given more weight than that of an examining consultant, and the opinion of a nonexamining

consultant is given the least weight. *Robinson v. Barnhart*, 366 F.3d 1078, 1084 (10th Cir. 2004).

A treating physician opinion must be given controlling weight if it is supported by "medically

acceptable clinical and laboratory diagnostic techniques," and it is not inconsistent with other

substantial evidence in the record. *Mays v. Colvin*, 739 F.3d 569, 574 (10th Cir. 2014). *See also*

20 C.F.R. § 404.1527(c)(2). Even if the opinion of a treating physician is not entitled to

controlling weight, it is still entitled to deference and must be weighed using the appropriate

factors set out in Section 404.1527. *Langley v. Barnhart*, 373 F.3d 1116, 1119 (10th Cir. 2004).

The ALJ is required to give specific reasons for the weight he assigns to a treating physician opinion, and if he rejects the opinion completely, then he must give specific legitimate reasons for that rejection. *Id.*

Here, the ALJ discussed the opinions given by Dr. Tandon in his assessment. (R. 27-28). After two paragraphs in her decision discussing other items, the ALJ returned to the opinion evidence, briefly summarizing Dr. LaGrand's report. (R. 28). After this discussion, she said she concluded that Barrett-Lassiter had greater capabilities than Dr. Tandon had reflected in his assessment. *Id.* She then said that Dr. Tandon "provided no evaluative evidence for the several 'marked' and 'severe' limitations" assigned in his assessment. *Id.* The ALJ then discussed the reports of Dr. LaGrand and Dr. Shadid in more detail, stating that she gave them great weight and that they were supported by objective findings. *Id.* In the next paragraph, she said that she gave Dr. Tandon's assessment "little weight," and she said that he was inconsistent in giving Barrett-Lassiter severe and marked limitations while also writing that she could perform activities of daily living and comprehend and remember instructions. *Id.*

Barrett-Lassiter argues that the ALJ did not follow the required two-step analysis and did not adequately discuss the required factors set out in regulations. *Krauser v. Astrue*, 638 F.3d 1324, 1330-32 (10th Cir. 2011); 20 C.F.R. § 404.1527. In a 2012 case, the Tenth Circuit rejected an argument that the ALJ had not sufficiently discussed treating physician opinion evidence:

> In sum, we reject [claimant's] contention that the ALJ's opinion does not adequately evaluate and discuss the medical-source evidence. Where, as here, we can follow the adjudicator's reasoning in conducting our review, and can determine that correct legal standards have been applied, merely technical omissions in the ALJ's reasoning do not dictate reversal.

*Keyes-Zachary*, 695 F.3d at 1167. The court also said that "common sense, not technical perfection, is [the] guide" of a reviewing court and that "[t]he more comprehensive the ALJ's

explanation, the easier our task; but we cannot insist on technical perfection." *Id.,* at 1166; *see also Lauxman v. Astrue*, 321 Fed. Appx. 766, 769 (10th Cir. 2009) (unpublished) (while "it would have been helpful if the ALJ had elaborated" on his analysis of opinion evidence, the ALJ's decision was adequate).

Here, the ALJ did not ignore Dr. Tandon's opinion evidence, and she gave legitimate reasons for discounting it. Pursuant to the Tenth Circuit's guidance in *Keyes-Zachary* and in *Lauxman*, the Court finds that the ALJ's analysis regarding Dr. Tandon's evidence is adequate. Beginning with the ALJ's explicit reasons for discounting Dr. Tandon's evidence, her first focus appears to be on whether his opinions were supported by objective evidence. (R. 28). The undersigned comes to this conclusion because the ALJ summarized aspects of the report of Dr. LaGrand and then said that she concluded that Barrett-Lassiter had greater capabilities than those reflected in Dr. Tandon's reports. *Id.* This discussion appears, therefore, to inquire about the legitimate question of whether Dr. Tandon's opinions were supported by objective evidence and whether they were inconsistent with other substantial evidence in the record. *Wells v. Colvin*, 727 F.3d1061, 1072-73 (10th Cir. 2013) (inconsistency with the record as a whole is generally a legitimate basis on which to discount or reject a medical opinion). The ALJ answered the question of whether Dr. Tandon's opinion evidence was inconsistent with other substantial evidence in the record by concluding that his opinions were inconsistent with those of Dr. LaGrand. She gave the specific example of Dr. LaGrand's finding that Barrett-Lassiter's ability to handle work stress and to deal with supervisors and coworkers was low average. (R. 28). The undersigned finds that the examples given by the ALJ of inconsistencies between the report of Dr. LaGrand and the limitations found by Dr. Tandon were legitimate and were supported by substantial evidence.

While the ALJ did not explicitly tie it to her discussion of Dr. Tandon's opinion evidence, another point in her decision is related. In discussing Barrett-Lassiter's credibility, the ALJ noted that a CREOKS evaluation labeled Barrett-Lassiter's social problems as mild and assessed her GAF as 51. (R. 29). The Court is mindful that *post hoc* justifications of ALJ decisions are not permitted. *Carpenter*, 537 F.3d at 1267. Here, however, the ALJ explicitly contrasted the severity of Barrett-Lassiter's limitations as reflected in her testimony and in Dr. Tandon's report, with the evidence of Dr. LaGrand's evaluation, and it seems clear to this reviewer that the ALJ's discussion of CREOK's treating evidence further supported her reasons for discounting Dr. Tandon's report.

Barrett-Lassiter also argues that Dr. Tandon's opinions were actually consistent with Dr. LaGrand's report and with some of the GAF scores in the record. Plaintiff's Opening Brief, Dkt. # 13, pp. 7-8. There are some similarities between areas of concern found by Dr. LaGrand and the marked and severe limitations found by Dr. Tandon. The ALJ's point, however, was that the degree of severity reflected in Dr. Tandon's assessment is undermined by the degree of severity reflected in Dr. LaGrand's report. She gave the example that Dr. LaGrand found that Barrett-Lassiter's ability to handle work stress and to deal with supervisors and coworker was "low average." (R. 28).

Barrett-Lassiter also argues that Dr. LaGrand's GAF assessment of 40 is consistent with Dr. Tandon's severe and marked limitations. Plaintiff's Opening Brief, Dkt. #13, pp. 7-8. While a GAF score can be helpful[6] in understanding a physician's views of the overall status of a patient,

---

[6] In *Krchmar v. Colvin*, 548 Fed. Appx. 531, 534 n.2 (10th Cir. 2013) (unpublished), the Tenth Circuit noted that use of the GAF score has been discontinued in the new fifth edition of the Diagnostic and Statistical Manual of Mental Disorders published in 2013.

that physician's written comments are even more helpful. *See Harper v. Colvin*, 528 Fed. Appx. 887, 891-92 (10th Cir. 2013) (unpublished) (no error when ALJ did not mention GAF score but did discuss physician's report). Here, Dr. LaGrand scored Barrett-Lassiter's GAF as 40, which is extremely low. *Salazar v. Barnhart*, 468 F.3d 615, 624 n.4 (10th Cir. 2006). More importantly, however, Dr. LaGrand provided the ALJ with a six-page narrative report giving the results of her assessment, including several opinions that related directly to Barrett-Lassiter's functional capacity. (R. 396-402). The ALJ discussed the narrative opinions of Dr. LaGrand and came to the conclusion that they reflected greater ability on the part of Barrett-Lassiter than was reflected in Dr. Tandon's assessment. (R. 28). As discussed above, the ALJ had supported reasons for giving Dr. LaGrand's opinions more weight than the opinions of Dr. Tandon, and the low GAF assessed by Dr. LaGrand does not negative those supported reasons.

Substantial evidence supported the ALJ's conclusion to discount Dr. Tandon's opinion evidence because it was not supported by objective evidence and it was inconsistent with other evidence.

A closely-related second reason for discounting Dr. Tandon's opinion evidence was that he had not provided evaluative evidence that reflected the severe and marked limitations included in his assessment. (R. 28). This reasoning is similar to that of the ALJ in *Beasley v. Colvin*, 520 Fed. Appx. 748, 751-53 (10th Cir. 2013) (unpublished). In *Beasley*, the ALJ gave the treating psychiatrist's opinions some weight, but found that some of the limitations he asserted were not supported by his treating records or other objective evidence. *Id.* at 751-52. The Tenth Circuit noted that the psychiatrist's records noted the claimant's mood and affect, but did not "include findings that [the claimant] exhibited or was experiencing significant functional limitations caused by her mental impairment." *Id.* at 752. *See also Banks v. Colvin*, 547 Fed. Appx. 899,

21

902-03 (10th Cir. 2013) (unpublished) (affirming ALJ's reasoning that treating physician opinion of marked limitations was not supported by the record).

The record in this case has only two references from Dr. Tandon, outside of the two forms reflecting his opinions. (R. 382-88, 452-55, 472). The first is the February 12, 2007 treatment plan. (R. 382-88). The plan did not give much insight into Barrett-Lassiter's ability to perform work-like activities, although it did state that Barrett-Lassiter was not working because she could not stand for long periods of time. *Id.* The second record signed by Dr. Tandon was a medical progress note dated January 24, 2008. (R. 472). He noted that Barrett-Lassiter complained of stress and anxiety that was related to the fact that she was taking care of her handicapped daughter. *Id.* He indicated that Barrett-Lassiter was improving on medication. *Id.* His other observations did not relate to functional capacity. *Id.*

In the Mental Status Form dated January 24, 2009 that accompanied Dr. Tandon's assessment, he described Barrett-Lassiter as having increased anxiety and mood swings when stressed. (R. 454). He said that Barrett-Lassiter informed him that she was unemployed due to leg problems that made her unable to stand for long periods of time and due to lack of education that made it difficult for her to find a job in another sector. *Id.* He noted that she was able to do activities of daily living, including showering, cooking, and cleaning. *Id.* Dr. Tandon also noted that Barrett-Lassiter reported that she went to her daughter's house to help her. (R. 455). He said that she could understand instructions and explanations given during treatment sessions. *Id.* He also noted that her mood swings could worsen if she was under stress due to the pressure of work. *Id.*

The question is whether the few documents signed by Dr. Tandon that were available to the ALJ support her conclusion that his opinions of severe and marked limitations were not

accompanied by "evaluative evidence."  (R. 28).  The undersigned finds that this conclusion by the ALJ was supported by substantial evidence.  There was very little treating or evaluative evidence of Dr. Tandon that related to Barrett-Lassiter's functional capabilities.  The closest evaluation that addressed the categories of activities for which he assessed severe and marked limitations was his observation that Barrett-Lassiter's symptoms might worsen with the stress of work.  This observation is simply not sufficient to support all of the severe and marked limitations that Dr. Tandon found.

Substantial evidence supported the ALJ's reason for discounting Dr. Tandon's opinion evidence because he did not provide evaluative evidence for his severe and marked ratings.

Barrett-Lassiter objects to the third reason given by the ALJ that Dr. Tandon's severe and marked assessed limitations were inconsistent with his statements that she could perform activities of daily living and could follow instructions.  (R. 28).  The undersigned agrees with Barrett-Lassiter's objection.  Stating that Barrett-Lassiter could shower, cook, and clean and that she could follow directions in a treatment setting does not equate to stating that she would have no problems in the categories of activities in which Dr. Tandon found that Barrett-Lassiter would have severe difficulty.  For example, her activities of daily living and her ability to follow instructions would not necessarily assist her in completing a normal work week - one category in which Dr. Tandon found a severe limitation.  While the third reason given by the ALJ is not supported, the undersigned finds that the ALJ's first and second reasons are adequate for discounting Dr. Tandon's opinion evidence.  Her reasoning that his opinions were inconsistent with other substantial evidence was a legitimate basis for discounting Dr. Tandon's evidence, as was her reasoning that Dr. Tandon had not supplied evaluative evidence for his findings of severe

and marked limitations. *Mays*, 739 F.3d at 574; *Wells*, 727 F.3d at 1072-73; *Beasley*, 520 Fed. Appx. at 751-53.

Barrett-Lassiter's arguments related to Dr. Tandon's opinion evidence are essentially a request that this Court reweigh the evidence, emphasizing the evidence that supports Barrett-Lassiter's disability claim, while discounting the evidence that does not support it. The Court must decline this invitation. *Newbold v. Colvin*, 718 F.3d 1257, 1265 (10th Cir. 2013). While Barrett-Lassiter's case, and the weight given to Dr. Tandon's evidence, might be susceptible to conclusions that differ from those made by the ALJ, it is not the Court's role to make findings in the first instance. 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive"); *Allen v. Barnhart,* 357 F.3d 1140, 1143-45 (10th Cir. 2004) (court acts within confines of its administrative review authority).

The ALJ's RFC determination was supported by substantial evidence and complied with legal requirements.

**The Issue of Obesity**

Barrett-Lassiter's second issue on appeal is that the ALJ failed to take her obesity into account. Plaintiff's Opening Brief, Dkt. #13, pp. 9-10. The ALJ, in summarizing Barrett-Lassiter's testimony, noted her weight and her BMI. (R. 26). Dr. Munn, the agency examining consultant, noted Barrett-Lassiter's weight, and Dr. Sanbar, the agency nonexamining consultant, also noted it. (R. 404, 429). Thus, this is not a case where the claimant's weight was ignored.

The important point, however, is that the ALJ, Dr. Munn, and Dr. Sanbar focused, rightfully, on what Barrett-Lassiter's functional limitations were, rather than on her status as an obese person. *See Jimison ex rel. Sims v. Colvin*, 513 Fed. Appx. 789, 793 (10th Cir. 2013) (unpublished). In *Jimison*, the Tenth Circuit rejected the argument of the claimant that the ALJ

should have included obesity in her RFC, because there was no evidence that her obesity caused functional limitations.  *Id.*  The same is true here.  Barrett-Lassiter testified fully in two hearings regarding her functional limitations.  (R. 49-61, 94-111).  She mentioned her weight gain, but she did not specifically cite her obesity as causing any functional limitations.  Barrett-Lassiter's attorney did not ask any questions specifying her obesity as causing limitations.  *Id.*  Barrett-Lassiter's argument regarding her obesity therefore is not persuasive, because she does not point to any functional limitations that were supported by the evidence that the ALJ failed to include in her RFC determination.

### Conclusion

The decision of the Commissioner is supported by substantial evidence and complies with legal requirements.  The decision is **AFFIRMED**.

Dated this 20th day of October 2014.

Paul J. Cleary
United States Magistrate Judge